Lewellyn ARCHIBLE, Plaintiff,

v.

METROPOLITAN LIFE INSURANCE COMPANY, Defendant.

No. 99-0361-MJ-C.

United States District Court,
S.D. Alabama,
Southern Division.

Feb. 2, 2000.

Michael S. McNair, Mobile, AL, for plaintiff.

George W. Walker III, Albert D. Perkins, IV, Copeland, Franco, Screws & Gill, P.A., Montgomery, AL, for defendant.

### MEMORANDUM OPINION AND ORDER

CASSADY, United States Magistrate Judge.

This cause is before the Court for a *de novo* review of the plan administrator's decision to terminate plaintiff's long-term disability benefits. (*See* Doc. 32 (this Court's December 2, 1999 determination that a *de novo* standard of review, rather than an arbitrary and capricious standard, was applicable to defendant's decision to terminate plaintiff's long-term disability benefits since the benefit plan did not expressly provide the administrator discretionary authority to make eligibility determinations or to construe the plan's terms as they relate to the issue of "general disability" as set out in the second paragraph of the plan under the general heading "TOTAL DISABILITY")) The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all further proceedings, including disposition of this case as described above. (*See* Doc. 31 ("In accordance with the provisions of 28 U.S.C. 636(c) and Fed.R.Civ.P. 73, the parties in this case hereby voluntarily consent to have a United States magistrate judge conduct any and all further proceedings in the case, including the trial, order the entry of a final judgment, and conduct all post-judgment proceedings.")) Upon consideration of the contents of the briefs, the joint evidentiary submission of the parties, and numerous exhibits filed in support of the defendant's motion for summary judgment,[1] the Court affirms the defendant's termination of plaintiff's long-term disability benefits.

### FINDINGS OF FACT

1. The Long–Term and Partial Disability Income Plan for all U.S. employees of Bell Atlantic Enterprises Corporation became effective on January 1, 1988. (Doc. 36, Exhibit 1) The plan defines total disability as follows:

---

1. The exhibits in this regard which are inherently important to this decision are those exhibits generated during the administrative appeals process following the May, 1996 termination of benefits. Why the parties did not include these exhibits in their joint submission is unclear since their relevancy is apparent given their submission in support of the summary judgment motion. If the parties were misled by any comments made by the Court during the hearing on December 2, 1999, they are made aware now that the Court views this case, at least procedurally, much like a social security case and as such the decision in this case terminating plaintiff's long-term disability benefits did not become final until MetLife's Appeals Council, on April 22, 1997, affirmed the May, 1996 termination of benefits.

A review of these administrative appeals exhibits makes clear to the undersigned that many of the defendant's objections to the plaintiff's evidence, particularly the documentation from Dr. Raymond Bell, is totally baseless.

During the first 24 months of your disability, in addition to your Qualifying Period, you must be unable to perform the normal duties of your regular occupation for any employer and you must at no time engage in any occupation or employment for pay or profit. This must be due to your disability. The Travelers will decide if this is the case.

After the first 24 months of your disability, in addition to your Qualifying Disability Period, you must be completely unable to engage in any occupation or employment for which you are or become qualified. You could be qualified because of your education, training or experience.

(*Id.*, at 20) The plan also provides that benefits will be paid to an individual only when the Qualifying Disability Period has been completed, the individual has "applied for and given all needed proofs for all Other Income Benefits" available to him, and the individual is under a physician's care. (*Id.*, at 6) No payment will be made, in the first instance, for total or partial disability which results from injury which is not treated by a physician. (*See id.*, at 10) Finally, the plan provides that during the course of an individual's total or partial disability, The Travelers Insurance Company ("Travelers") can request written proof, from time to time as needed, that the "Total Disability or Partial Disability has been and is continuous." (*Id.*, at 11)

2. Following an automobile accident in September of 1989, Archible was determined to be eligible for long-term disability benefits by Travelers. (Doc. 36, Exhibit 29, Affidavit of Lewellyn Archible;[2] *see also* Exhibit 1) In addition, plaintiff was determined to be disabled by the Social Security Administration and eligible for benefits as of March of 1990. (*See id.*, Exhibit 28) Archible continues to receive disability benefits from the Social Security Administration. (*See id.*)

3. On May 12, 1993, Travelers notified Archible by mail that it was updating his disability claim and to that end requested that he have his doctor complete and return to it the Attending Physician's Statement that was enclosed in the mailing. (*See id.*, Exhibit 2) Travelers also asked plaintiff to answer several questions and to complete an enclosed Authorization to Disclose Information. (*Id.*)

4. Archible telephoned Travelers on May 18, 1993 and inquired about the need for a medical update. (*Id.*, Exhibit 3) Upon being informed that the company needed ongoing documentation to support his disability claim, Archible told whoever he was speaking to that he was not seeing a doctor at the present time. (*See id.*) Plaintiff was told that he needed to go to a doctor and get the form filled out and returned same to Travelers as soon as possible. (*See id.*)

5. On August 4, 1993, Travelers requested that plaintiff return to it the forms sent to him in May. (Doc. 36, Exhibit 4) "To enable us to give further consideration to your claim, we request that you PLEASE RETURN FORMS SENT TO YOU IN MAY, 1993 WITHIN THE NEXT THIRTY DAYS. THIS IS SECOND REQUEST, PLEASE DO NOT JEOPARDIZE YOUR BENEFITS." (*Id.*)

6. On August 31, 1993, Travelers sent the following letter to Archible:

In order to process your claim, we need additional medical information. We cannot secure this without your permission and authorization. Please read the enclosed Claimant's Authorization and sign where indicated. This form will allow us to request specific medical information that relates to your claim. If you have any questions, please contact us at the above toll-free number.

(*Id.*, Exhibit 5)

7. On September 27, 1993, Dr. Eugene A. Quindlen examined plaintiff. (Doc. 36, Exhibit 7)

---

**2.** The defendant's objection to Archible's affidavit is sustained for the reasons set forth in the defendant's brief with respect to all statements made therein except those contained in the first paragraph.

On examination today he has no para-cervical muscle spasm. He has good cervical range of motion. Strength is 10/10 in all groups in his lower extremities. Deep tendon reflexes are 2+ bilaterally equal. Romberg is negative. Review of his MRI scan from 12/89 shows evidence of centrally ruptured discs at C5–6 and C6–7, which are fresh. There is a slight bulge at C3–4. His MRI from 4/93 shows old discs at C5–6 and C6–7, with some other changes at C3–4 and C4–5, and some decrease in the height of C6. There is adequate room for his cord and roots.

(*Id.*) Quindlen's impression was "[o]ld discs—C5–6 and C6–7 without radiculopathy or myelopathy." (*Id.*) At the bottom of Quindlen's clinical notes, the doctor's office inserted the following notation: "Travelers: We are not the attending MD[.][W]e only did one evaluation[¤] see above[.] Dr. Robert White or some other[,] not us[,] to do this form." (*Id.*)

8. On November 15, 1993, Dr. James C. Burton completed an Attending Physician's Statement ("APS"). (*Compare* Doc. 36, Exhibit 6 *with* Doc. 36, Exhibit 13 (signature of Dr. Burton on Exhibit 13 and information contained therein substantially same as signature and information contained on Exhibit 6))[3] The completed form reveals a diagnosis of cervical disc syndrome based upon a last visit of March 31, 1993. (*Id.*) Dr. Burton expressed the opinion that plaintiff was capable of performing sedentary to light activity which did not require climbing or repetitive fine finger movements of the dominant right hand. (*See id.*) The form reveals that as of the last date that plaintiff was seen, March 31, 1993, Archible could continuously sit for eight hours, intermittently walk and stand eight hours each, continuously lift up to ten pounds and occasionally lift ten to twenty pounds. (*Id.*) Under the MENTAL/NERVOUS IMPAIRMENT section, the doctor circled Class 1—"Patient is able to function under stress and engage in interpersonal relations (no limitations)[.]" (*Id.*)

9. On January 19, 1994, Case Specialist Virginia Jones wrote Archible again requesting information to update his disability claim. (Doc. 36, Exhibit 9)

Please have your current treating physician complete and return the enclosed Attending Physician's Statement form within 30 days.

Please complete and return the enclosed Authorization to Disclose Information form. PLEASE REFER THIS ATTENDING PHYSICIAN STATEMENT TO DR. ROBERT WHITE FOR COMPLETION WITHIN 30 DAYS, SIGN AND RETURN 2 AUTH. FORMS ALSO.

(*Id.*)

10. On March 21, 1994, Virginia Jones penned the following letter to plaintiff:

We have written to you several times requesting an update on your medical condition. As of today, we have not received a response. Enclosed you will find copies of letters previously mailed to you. Please be advised that it is your responsibility to provide The Travelers Insurance Company with proof of your continuing disability. Also, any charges incurred in connection with providing The Travelers Insurance Company with a medical update are your responsibility. If not received within 30 days of the date of this letter, your benefits will be terminated.

(Doc. 36, Exhibit 10) The plan administrator took no action after thirty days; rath-

---

**3.** The defendant references Dr. Quindlen as the author of this APS but, as aforesaid, a comparison of this unsigned APS with the APS signed by Dr. Burton on March 2, 1995 (Exhibit 13) clearly reveals that Dr. Burton completed both forms. Moreover, it is clear from the typed notation Dr. Quindlen's office made on a copy of his neurosurgery clinic notes for September 27, 1993, that Dr. Quindlen specifically refused to complete an APS (*see* Exhibit 7). Not surprisingly, therefore, Dr. Quindlen did not respond to Case Specialist Virginia Jones' December 6, 1993 letter (*see* Exhibit 8) requesting that he complete a medical questionnaire regarding plaintiff's condition.

er, eight months later Case Manager Constance Moore requested additional information from plaintiff so that the administrator could update his disability claim. (*Id.*, Exhibit 11) "Please have your current treating physician complete and return the enclosed Attending Physician's Statement form within 30 days. Please complete and return the enclosed Authorization to Disclose Information form. PLEASE ALSO COMPLETE THE ENCLOSED PERSONAL PROFILE EVALUATION AND RETURN TO THIS OFFICE." (*Id.*)

11. On March 8, 1995, a different case manager, Gloria Lopez, wrote to Archible to inform him that the Attending Physician's Statement had yet to be received. (*Id.*, Exhibit 12) Attached to this letter, was a letter sent by the plan administrator to Dr. James Burton on July 20, 1995. (*See id.*)

> As we are in the process of evaluating Mr. Archible's Long Term Disability claim, we are in need of additional information from you to assist in our evaluation.
>
> Please forward copies of all Office Notes, Laboratory and testing results. As previous Attending Physicians Statements indicate continued Neurological and Neurosurgical evaluation, I am particularly interested in reviewing these specific reports. Please submit all relative documentation for the period October 26, 1994 through the present.
>
> In addition, please take the time to complete and return the enclosed Physical Capacity Evaluation.

Enclosed is an Authorization for Release of Information and self-addressed envelope for your convenience.

Please be assured that this information is important to the complete review of Mr. Archible's claim. I am appreciative for your cooperation in providing a response at your earliest convenience. (*Id.*) [4]

12. On March 2, 1995, Dr. James C. Burton completed and returned to the plan administrator another Attending Physician's Statement form. (Doc. 36, Exhibit 13) This form, like the first one completed by Dr. Burton, reveals that plaintiff's first visit to Burton was July 29, 1991 and that Archible was seeing the doctor on a "PRN" or "as necessary" basis, his last visit occurring on October 26, 1994. (*Id.*) On the occasion of filling out this particular form, Burton found the MENTAL/NERVOUS IMPAIRMENT section to be inapplicable but did make several significant remarks about Archible: "When initially evaluated on 7/29/91 I did not feel he was totally disabled. Partial disability only then and now. He is at MMI." (*Id.*) On this form, Burton indicated that plaintiff could continuously sit, stand and walk for 8 hours each, continuously lift up to 10 pounds, frequently lift between 10 and 20 pounds, occasionally lift between 20 and 30 pounds, never climb, and repetitively perform fine finger movements, eye/hand movements and pushing/pulling with his dominant right hand and his left hand. (*Id.*) [5]

13. At the request of the Social Security Administration, plaintiff underwent a

---

**4.** On this same date, a similar letter was written to Dr. Michael Scott. (Doc. 36, Exhibit 14) Dr. Scott's office made a handwritten notation to Travelers on a copy of the July 20, 1995 letter it received from the company: "This is the only thing we have on the above patient. He saw Dr. Thangada only once and never returned so Dr. Thangada never completed his chart[.]" (*Id.*) Dr. Thangada saw plaintiff at the Atmore Community Hospital on April 13, 1994; he diagnosed cervical stenosis. (*See id.*) Based upon this April 13, 1994 visit, Dr. Michael Scott completed an APS in Dr. Thangada's stead and dated same

April 13, 1994. (*See* Doc. 14, Exhibit 9 (referencing the pertinent exhibit filed in support of the motion for summary judgment because the joint submission inadvertently fails to contain the back page of Dr. Scott's APS)) Dr. Scott, a board-certified family practice physician, noted in the stead of Dr. Thangada, a neurologist, that as of April 13, 1994, plaintiff was able to intermittently sit and walk one hour each, intermittently stand two hours and never lift anything. (*See id.*)

**5.** Dr. Burton is a board-certified orthopedic surgeon. (*Id.*)

comprehensive examination by Dr. Raymond L. Bell, an internist specializing in gastroenterology, on June 6, 1995. (Doc. 36, Exhibit 30)

Mr. Archible['s] major complaints at the time of this examination, were generalized aches [and] pains, resulting from an injury two-three years ago.

He was traveling in a van when suddenly the car in front of him, spun around and he hit the vehicle straight on. This resulted in a very powerful forward motion of his neck, allegedly resulting in injuries [to] three cervical vertebrate. Since that time, he has had headaches. The headaches tend to occur in the temporal area and radiate[ ] back toward the neck. The headaches are of a constant nature. He takes Esgic along with Tylenol # 4 which provides partial relief of the headaches. In addition, he takes Naprosyn for the headaches. He denies seizures, loss of consciousness. However, during periods of intimacy, he becomes very dizzy and on one or two occasions, came close to losing consciousness.

He complains of back pain radiating from his lumbar area up to his neck, bilaterally across both shoulders. This tends to be much more noticeable when he tends to pick up anything, especially his 2 ½ year old daughter. In that respect, he is limited to lifting almost everything.

He also has a tender sensation to the left shoulder which tends to cause him [ ] quite [a] bit of discomfort, especially[ ] when he exerts himself.

Other than these problems, he has difficulty concentrating. He has almost become a recluse. He feels very uncomfortable in a social setting. He worked formerly as an engineer but feels that he is unable to do that kind of work currently. Surgery has been recommended but he is extremely reluctant to undergo any procedure at this time.

.　　.　　.　　.　　.

PHYSICAL EXAMINATION:
GENERAL: Well developed, well nourished male looking rather depressed.

.　　.　　.　　.　　.

█ NECK: Supple. He can move his neck in all directions without significant pain. There is no dizziness when he flexes his neck. There is no cervical adenopathy noted.

EXTREMITIES: There are good reflexes. Strength in both legs. He can squat and bend without difficulty. On palpation of the lumbar area, there is no significant pain or point tenderness. He rotates his waist and torso without difficulty. Sensory perception-intact.

IMPRESSION:

1. CARDIOVASCULAR STATUS: Functional classification I.

2. MUSCULOSKELETAL STATUS: This is an extremely complex case. The client alleges headaches, back pain, and shoulder pain as a result of an injury six years ago involving his vertebra. It is very difficult to document any objective findings on this examination, however, you get the impression that this client has a significant emotional problem dealing with the alleged injury. There is a tremendous amount of fear involving possible surgery and obviously, he wants a 100% guarantee that it will relieve him of his current problems.

3. PSYCHIATRIC ASSESSMENT: There is obviously some depression in this young man. He feels somewhat cheated and obviously, feels less than a man on many occasions because he is unable to perform in a normal and expected manner. This may be a secondary phenomenon to his alleged injury six years ago. In any case, the client is obviously disabled either from a physical aspect or perhaps, an emotional aspect, even perhaps, both aspects.

(*Id.*) [6]

14. On July 21, 1995, an IME request form was completed by Case Manager Pat-

---

**6.** The defendant's objection to this document, as well as all other evidence submitted by the plaintiff, is overruled. *See Kirwan v. Marriott*

rick Hurley; the request was for an examination by a neurological and/or orthopedic physician. (*See* Doc. 36, Exhibit 16) Hurley wrote Dr. Elias G. Chalhub on November 7, 1995, and informed Chalhub that an independent medical examination had been scheduled for Archible on November 27, 1995 in order to help the plan administrator evaluate Archible's ability to return to work. (Doc. 36, Exhibit 17)

PLEASE CONDUCT NEUROLOGICAL EVALUATION. EVALUATE FOR PRESENCE OF NEUROLOGICAL IMPAIRMENT AS RESULT OF HNP. WHAT'S THE CURRENT LEVEL OF FUNCTIONING. WHAT FACTORS WOULD PRECLUDE THIS CLAIMANT FROM PERFORMING WORK IN A SEDENTARY CAPACITY. IS THIS CLAIMANT TOTALLY DISABLED.

Immediately following the examination, please send a detailed narrative report which includes:

1. Primary and secondary diagnosis(es) with ICD–9 codes, and any resulting impairment(s);

2. Your comments, based upon the diagnosis(es) noted in # 1 above, regarding the severity of this client's illness in relation to others with the same diagnosis(es) that you have encountered in your professional practice;

3. Your comments regarding the current treatment plan and medication, the client's response and any suggestions you may have for change(s) to the plan;

4. Prognosis for this client to return to his/her former job or other work;

5. Functional abilities and limitations, along with any restrictions that might impact a safe return to work;

6. The client's perception of his/her ability to return to work[;] and

7. Vocational rehabilitation potential.

You may order routine laboratory test[s] and/or x-rays that may be necessary. However, if the cost for these tests/x-rays exceeds $100.00, please call me at the toll-free number shown above prior to performing these tests.

Medical and any applicable occupational information from our claim file will be sent to you under separate cover. Also, the client[ ] has been instructed to provide you with a list of current medication(s) and to bring along any x-rays pertaining to his/her disabling condition. Please send your report and bill to my attention at the above address. Also please send a copy of your report to the client's attending physician; the physician name and address can be obtained directly from the client at the time of the examination.

(*Id.*)

15. By letter dated November 8, 1995, the plan administrator notified Archible that he was scheduled for an independent medical evaluation to be conducted by Dr. Elias Chalhub on November 27, 1995. (Doc. 36, Exhibit 18)

16. Dr. Chalhub reported the results of his examination of Archible to the plan administrator by letter dated November 30, 1995. (Doc. 36, Exhibit 19)

I evaluated the above stated patient on November 30, 1995. As you recall, he is a 35 year old African–American male, who at age 29 was involved in a motor vehicle accident with a head on collision. He says there may have been loss of consciousness and may have had some weakness in his lower extremities. However, he did not go to the hospital to seek medical assistance at that time. Subsequently he started developing headaches, basically in the frontal area which are a throbbing pain and at that time could last continuously 24 hours a day. He says there is no loss of con-

Corp., 10 F.3d 784, 789 (11th Cir.1994) (a court conducting a *de novo* standard of review may consider any relevant evidence in existence regarding an individual's disability at the time the plan administrator's decision was made regardless of whether this evidence was made available to the administrator).

sciousness, no focal neurological deficit. He was seen by multiple physicians which included Dr. Fleet, Dr. Robert White, Dr. Eugene Quindlen and currently sees physicians in Louisiana, a Dr. Scott and Dr. Butler (sic). He has had numerous studies performed which has included MRI's of his brain, cervical spine which have revealed a C5–6, C6–7 herniated nucleus pulposus which does not appear to be causing any radiculopathy or myelopathy. He states that his headaches are under reasonable control and is taking Naprosyn three to four times per day, Esgic Plus three to four times a day and Tylenol # 4 two to three times per day. He has been on multiple medications in the past. He said that he cannot remember all of them but does not at this point wish to try any additional medications. He does not recall Amitriptyline or Clonazepam. [H]e has been on some anticonvulsant medications and has been on multiple analgesics and nonsteroidal anti-inflammatories.

In addition to his headaches he says he still has spasms in his back and some intermittent dizziness. He is not allergic to any medications. He is not employed. He says that he cannot work doing the job that he did before which was an electrical engineer. He says that he does not wish to try any medication. He states that if he reduces his medication his headaches come back. If he takes it continuously he says that he is groggy to work. He has had no operations. He does not smoke. He does not drink. He is basically on disability income. He is not married. He lives in Mobile. He has had no recent trauma, infection or accentuation of his process.

On physical examination his blood pressure is 130/70. His pulse is 80, respirations are 16. His weight is 179 pounds. His head is of normal shape. There are no bruits over his head or neck. His chest, heart and abdomen are normal. Extremities are symmetrical. Eyes, nose and throat are normal. Examination of his nervous system shows that his pupils are equal and reactive. His extraocular movements are full. His face is symmetrical to grimace and IX through XII are normal. Examination of his motor system shows that he has normal tone and normal strength. He has full range of motion of all extremities. He has no involuntary movements. He has no fasciculations. His muscle mass appears to be normal.

His reflexes are 1 to 2+ in the upper extremities and are symmetrical and 2+ in the lower extremities and symmetrical.

He is intact on finger to nose and rapid alternating movements. His gait is normal with good associative movements. He is intact to multiple modalities with sensation. I cannot detect any significant abnormalities.

In summary I find that he has a normal neurologic examination with normal muscle strength, normal reflexes and normal cranial nerve findings.

He has documented by x-rays disks at two levels which do not appear to be causing any significant radiculopathy, myelopathy or clinical symptoms. He has headache which would be best described as vascular headaches. I find it most unusual, if at all, to have headaches related to an accident in 1989.

I would think that he should not have any significant functional limitations, perhaps not lifting in excess of 50 to 70 pounds, but certainly he is able to perform most normal duties. He appears not to be very well motivated to return to his previous employment at the present time. He certainly would be an excellent candidate at age 35 without any significant neurological disability for vocational rehabilitation potential.

I hope this information is helpful to you. There are certainly additional medications and additional modes of therapy that would be of assistance to this individual if he is so inclined.

(*Id.*)

17. During the first few months of 1996, the plan administrator considered

referring Archible to a vocational rehabilitation specialist for a functional capacity assessment but by May 8, 1996, the administrator determined that there was no need for the assessment and that plaintiff's benefits could be discontinued based upon the information contained in the file. (*See* Doc. 36, Exhibits 20–24) On May 17, 1996, defendant Metropolitan Life Insurance Company ("MetLife"), who had taken over all of The Travelers Insurance Company's long-term disability claims as of January 3, 1995 (*see* Doc. 15, Exhibit 32), notified Archible that his long-term disability benefits would terminate as of May 31, 1996 (*see* Doc. 36, Exhibit 26).

> As you are aware, we have been attempting to schedule an appointment for you to attend a Functional Capacity Evaluation. Your recent change of residence and providing us with a telephone beeper number as a means of contact has created delays in locating a facility in your area of residence in addition to readily contacting you via telephone.
>
> From your most recent telephone contact with our Rehabilitation Coordinator, you indicated that you have not remained in active treatment nor under the continuing care of a qualified physician.
>
> As you have indicated that you have not remained in active treatment with a physician, which the Long Term Disability contract provisions require you to comply, continued approval of your claim is contra-indicated at this time.
>
> Therefore, we have determined to withdraw approval of your claim. This is to be effective May 31, 1996 upon which you shall receive the final benefit in the amount of $805.00 for the benefit period May 1, 1996 through May 31, 1996.
>
> If you disagree with this decision, you may file a written request for review of your claim within 60 days upon receipt of this letter. Your letter should state the reason you believe your claim should have been treated differently and you must include any new facts or new medical information that you consider pertinent for us to give your appeal proper

consideration. Upon our receipt of your request for review, you will receive a written response within a reasonable time.

(*Id.*)

18. The record makes clear that the claims representatives for the plan administrator were of the opinion that plaintiff could transfer the work skills he possessed as a senior field engineer for Bell Atlantic to the following sedentary and light positions in the same industry: scale model maker, assembler, test-desk supervisor, electronic scale tester, printed circuit board assembly group leader, and switchgear repairer. (*See* Doc. 36, Exhibit 21)

19. Not surprisingly, when Archible received notice of the termination of benefits he was extremely unhappy and elected to appeal the termination decision. (Doc. 15, Exhibits 27 & 28) In his July 11, 1996 letter appealing the decision, Archible notified MetLife for the first time that Dr. Raymond Bell was his primary care physician and, in addition, he provided a pharmacy printout of the medications he was presently taking. (Doc. 15, Exhibit 27; *see also* Exhibit 27B (Dr. Raymond Bell's notation on prescription pad that as of July 9, 1996 he is the provider of medical care for Archible); Exhibit 27C (pharmacy list of medication from April 16, 1996 through July 10, 1996)) Moreover, attached to Archible's letter was a letter from Dr. Michael D. Scott to Case Manager Patrick Hurley chronicling his professional association with the plaintiff. (Doc. 15, Exhibit 27A)

> Mr. Archible has requested that I submit a letter to you regarding my involvement in his ongoing care which began for me on March 1, 1994. A professional relationship was established when Mr. Archible presented to my office with complaints of continued headaches and neck, upper and lower back pains which had been present since sustaining injury in a motor vehicle accident September 1989. He expressed concern that these chronic symptoms were then newly asso-

ciated with upper extremity paresthesias intermittently and with near-syncopal episodes occurring with vigorous activity, notably with lifting his daughter, with sexual activity and with physical therapy. He remarked further that his pain had become continuous and, though it was relieved with taking Naprosyn and Esgic Plus, he expressed concern over the long-term necessity of their use. He at that time also reported having sore throat, nasal congestion and was noted, incidentally, to have an elevated blood pressure which was not previously apparent.

All previous medical records as well as the MRI Scan done 12/89 were obtained and reviewed. Post-traumatic herniation of cervical discs at the C5–6 and C6–7 levels with cervical radiculopathy was confirmed. Suggestion of possible spinal stenosis was also discovered. Neurologic examination prior to and at the time of my own examinations were without focality. The apparent progression of Mr. Archible's previously "stable" symptomatology prompted me to request a current neurologic opinion regarding his clinical status at that time. Though this was accomplished by Dr. Praveen Thangada, staff Neurologist at our institution then, his dictation of this assessment remains to this day unavailable due to a problem with its recording. Dr. Thangada has since relocated to Texas.

My office practice has subsequently been discontinued, allowing for my full-time coverage of our Emergency Department. The final day was June 30, 1994. All of my patients, including Mr. Archible, were notified in advance and encouraged to establish themselves with another physician of their choosing. Since then I have spoken intermittently with him, several times in fact, regarding requests to renew his usual medication regimen consisting of Esgic Plus, Naprosyn and Tylenol # 4. In support of his requests for my assistance in providing these medications, he indicated his continued regular need for them and expressed his difficulty in locating another primary care provider. My reluctant compliance with these requests were (sic) done with attendant affirmations to readily secure follow up with some other physician as soon as possible. Dates for these provisions can perhaps be obtained from the K-mart Pharmacy records by Mr. Archible if requested. Please contact me if there are any questions or if my assistance is needed in any way.

(*Id.*)

20. By letter dated July 23, 1996, MetLife acknowledged Archible's appeal of the withdrawal of approval for long-term disability benefits. (Doc. 15, Exhibit 28)

We have reviewed the medical information provided. Dr. Scott indicated that he dissolved his private practice effective 6/30/94 with recommendation that you establish treatment with another physician.

In addition you have provided documentation indicating that Dr. Raymond Bell is now your treating physician effective 7/9/96. There was no additional medical documentation substantiating your treatment from 6/30/94 to the present submitted.

At this time, we are recommending that you provide additional medical documentation from your treating physicians for the period 6/30/94 through the present. Please submit the additional medical documentation within 30 days upon receipt of this correspondence. Upon our receipt, we shall forward your file for an independent claim review in consideration of your appeal. Should we not receive any additional information by August 31, 1996, we shall forward the available information for the independent review.

(*Id.*) On August 16, 1996, Archible responded to the request for additional medical information. (Doc. 15, Exhibit 29)

I recently received a response to the letter and information you requested.

But, apparently you did not understand the statement from Dr. Scott stating that his office was closed. This *does not* mean that he no longer practices medicine. Enclosed you will find a memorandum from my physician (Dr. Bell) stating an initial examination was done in his office last year. If you need further information on my medical condition, it would be wise to contact Dr. Parker and submit the necessary fees to obtain the information at the cost of your company, seeing that you are withholding **my** money for the injuries that I have sustained. At this point, not only am I suffering from pain I am getting pissed off with the way you are holding my money. I would like for you to Federal Express my three (3) checks to **1361 St. Madar Street, Mobile, AL 36603.** Also, I am requesting a copy of my *1989 Long–Term Disability Packet.*

(*Id.* (emphasis in original); *see also* Exhibit 29A (August 2, 1996 letter from Dr. Bell stating that Archible was seen by him on June 6, 1995 for a Disability Determination Examination))

21. On September 23, 1996, MetLife disability manager Robert F. Joy wrote to Archible to confirm a telephone conversation he had with the plaintiff on September 20, 1996. (Doc. 15, Exhibit 30)

You requested a copy of your Long Term Disability (LTD) Plan booklet. I am enclosing a copy of the booklet as you requested. I am also enclosing a copy of the letter dated May 17, 1996 explaining the reasons your LTD benefits were withdrawn.

As you can see, you are not under the regular care of a physician as explained in our letter. After this letter was sent, you provided us with: an undated letter from the Atmore Community Hospital under the signature of Michael D. Scott, MD, a handwritten note from Dr. Raymond Bell which states ".. I am the medical provider of medical care of Mr. Lewellyn Archible-as of 7–9–96 ..", an itemized listing of prescriptions from Kmart pharmacy for the period 4–1–96–7–15–96, and a typed statement from

Raymond Bell, saying you were seen on 6–6–95 for a Disability Determination Examination.

We wrote to you on July 23, 1996 summarizing the above information, and asking for medical documentation from June 30, 1994 to the present time. To date you have not done that so we cannot continue to issue LTD benefits to you without medical substantiation showing you are Totally Disabled from all occupations. This is the reason(s) your LTD claim has been withdrawn.

(*Id.*)

22. Archible replied to Joy's request for additional information by letter dated November 1, 1996. (Doc. 15, Exhibit 31)

The data you are requesting has already been submitted, should you stop reading between the lines. When I was declared disabled in 1989, it is obvious that my condition still persist[s]. Unfortunately, the intensity of the pain continues to grow.

Number one, notice the letter you mailed to me, dated May 17, 1995, when your company was nowhere in the picture, attempting to explain why your company was withdrawing my disability benefits. I have received LTD benefits since 1989 due to an accident which left me disabled while working on the job. Now it is 1996 and your company has taken over and has no earthly idea nor has made an attempt to acquire the necessary information from Traveler's (sic) surrounding my disability. Secondly, the LTD booklet does not state to be under the regular care of a physician. It says, "be under the care of a qualified physician." For instance, when I was under the care of Dr. Butler, I would see him once a year or once every two years, this was the care of a qualified physician who was accepted by the insurance company. Now, are you implying that Drs. Scott, Parker and Bell are not qualified or what? The LTD booklet does not state to be disabled from all occupations. It says, "you must be com-

pletely unable to engage in any occupation or employment for which you are or become qualified. You could be qualified because of your education, training or experience." There is a difference between all occupations and what I graduated, trained and worked for all my life.

Enclosed you will find a letter from Dr. Bell reiterating the fact that I am truly disabled.[7] It is my understanding that you are ignoring the statements of Dr. Scott who has seen me for several years. It behooves me to undergo such unnecessary scrutiny. However, I will have no choice to seek legal actions if this situation is not rectified promptly. Upon reviewing the letter sent by Dr. Bell I would appreciate my six months back pay along with ten percent interest sent by Federal Express to 1361 St. Madar Street, Mobile, AL 36603.

(*Id.* (footnote added))

23. Joy attempted to address all of plaintiff's concerns referenced in the November 1, 1996 letter by letter dated November 14, 1996. (Doc. 15, Exhibit 32)

On January 3, 1995 all of the Travelers Long Term Disability (LTD) claims were transferred to MetLife. We just changed names of companies. We now are the administrator of your LTD claim. This is the same claim that originated when you last worked on September 5, 1989. The Bell Atlantic contract canceled with The Travelers and did not convert to Met paper. Since your disability preceded the policy cancellation, benefits were paid to you after the policy cancellation.

The LTD booklet I made referenced (sic) to was a booklet marked proof. I did not recognize this until I received you (sic) letter of November 1, 1996. Notwithstanding, the policy and booklet requires all employees who receive LTD benefits to be under the care of a physician. You cannot be under the care of a physician and take an active role in attempting to recover from your disabling condition if you are only treated once a year or once every two years. This is not being compliant with the policy requirement.

The third point pertains to the definition of disability after you have received benefits for 24 months. In order to continue to receive benefits after 24 months, you must be unable to perform the material duties of any occupation for which you are or may become qualified by education, training, or experience. This means that if there are occupations in the marketplace that, given your medical restrictions and limitations, indicate you have the capability to do after you receive additional education, or training, then you do not meet the definition of Total Disability.

We are not ignoring the medical information from Dr. Bell. Dr. Bell does not provide us with any medical information to support the conclusion that you are unable to work at occupations for which you are qualified or could become quali-

---

7. Bell's letter, dated October 21, 1996, reads in relevant part as follows:

Mr. Archible was seen by me initially, June 6, 1995, for a comprehensive examination. After his narrative concerning his injury which occurred in 1989, he complained of chronic pain involving his head, neck, shoulders, and occasionally, his back. These complaints have been thoroughly evaluated and workup (sic) by various physicians and it appears that the final conclusion was that he would have these symptoms indefinite. At the time of my examination, this was the case and even at this point, more than a year later, he continues to have basically the same complaints. In that regard, he has been maintain[ed] on pain medication to include Tylenol with Codeine, Naprosyn and Esgic plus.

Based on these findings, I would have to conclude that this client is in fact, is in chronic pain and therefore, he continues to be disabled.

(Doc. 15, Exhibit 31A) Bell added an addendum to this letter by letter dated January 10, 1997. (Doc. 15, Exhibit 33 ("Due to his chronic pain, I feel that Mr. Archible is unable to work any form of gainful employment and unable to work in any occupational position due to extreme chronic pain."))

fied by education, training, or experience. If you choose to seek legal actions that is entirely your right to do so. I cannot send you retroactive benefits because there is no basis to pay those benefits. We do not pay interest since there are no policy provisions permitting us to pay that expense.

I am sorry, but our decision remains unchanged. Thank you for letting us be of service to you, and I wish you the best in your return to the marketplace.

(*Id.*) Archible's January 1, 1997 response to Joy's letter of November 14, 1996 was very brief: "I am not pleased with your decision and will take further actions. Therefore, I have decided to **appeal** the circumstances surrounding my long-term disability case. As a result, you will be hearing from my attorney in weeks to come." (*See id.*, January 1, 1997 Letter from Archible to Joy)

24. On March 18, 1997, Sonje W. Wilkerson, Esquire, notified MetLife that the law firm of Wilkerson, Tate & Williams represented Archible and in that capacity requested that plaintiff's long-term disability benefits be immediately reinstated. (*See id.*, March 18, 1997 Letter form Wilkerson to MetLife) Joy responded to Wilkerson's letter by letter dated March 25, 1997 and by way of explanation of MetLife's position on the termination of benefits he attached to his letter a copy of the letter which had been sent to Archible explaining "why Long Term Disability (LTD) benefits have not been paid." (*See id.*, March 25, 1997 Letter from Joy to Wilkerson) In addition, on April 7, 1997, Case Manager Lisa Sisson notified Wilkerson that Archible's claim had been referred to the company's Appeals Council for an independent review. (*See id.*, April 7, 1997 Letter from Sisson to Wilkerson) "You will be notified within a reasonable period of time with regard to this review." (*Id.*)

25. By letter dated April 8, 1997, Wilkerson made the following inquiry of MetLife: "Please advise whether it is your position that Mr. Archible's disability benefits will be reinstated if Dr. Bell provides you with medical information indicating that Mr. Archible is unable to work at any occupation and could not be qualified to work at such in the future." (Doc. 15, Exhibit 34) Sisson responded to Wilkerson's inquiry on April 15, 1997. (Doc. 15, Exhibit 35)

Please be advised, as per my letter of April 7, 1997, this file is currently being reviewed by the Appeals Council. Since Mr. Archible's claim has gone to the Appeals Council, I've made 3 requests to Dr. Raymond Bell's office to submit medical documentation. As of this date, we still haven't received a response from Dr. Bell. If medical (sic) isn't submitted to this office for review by Friday, April 18, 1997, the current review will continue based upon the medical that is already on file.

(*Id.*)

26. On April 22, 1997, Wilkerson was advised of the Appeals Council's decision. (Doc. 15, Exhibit 36)

We have completed the full and fair review of the termination of Mr. Archible's Long Term Disability claim. For the reasons noted below, it is our determination that the termination of his claim effective May 31, 1996 was proper, and we therefore must uphold the termination.

According to the Bell Atlantic Corporation Long Term Disability plan, to be considered totally disabled, the following requirements must be met:

During the first 24 months of your disability, in addition to your Qualifying Disability Period, you must be unable to perform the normal duties of your regular occupation for any employer, and you must at no time engage in any occupation or employment for pay or profit. This must be due to your disability. MetLife will decide if this is the case.

After the first 24 months of your disability, in addition to your Qualifying Disability Period, you must be com-

pletely unable to engage in any occupation or employment for which you are or become qualified. You could be qualified because of your education, training or experience.

No payment is made for disability which results from injury or sickness which is not treated by a physician, i.e.[,] in order to receive payment you must be under a physician's care.

Please refer to our previous letters dated July 23, 1996, September 23, 1996, November 14, 1996 and March 25, 1997 which explain our position with regard to Mr. Archible's claim situation.

The documentation has again been carefully reviewed. Records show Mr. Archible's history of a motor vehicle accident with head and neck trauma in September, 1989. He has been diagnosed with cervical disc syndrome and has continued to complain of chronic head, neck, arm and occasional back pain.

The most recent information we have concerning Mr. Archible's condition is Dr. Raymond Bell's brief January 10, 1997 letter. Dr. Bell simply states that, due to chronic pain, he feels Mr. Archible is unable to work. He does not provide any documentation in support of his opinion and does not provide any dates of examinations or treatment. The October 21, 1996 letter by Dr. Bell also provides limited information. He notes that he examined Mr. Archible on June 6, 1995 but provides no findings. He also reports Mr. Archible's subjective complaints and notes that they persist more than a year after his examination, but that again does not provide any other significant information or documentation of ongoing medical care. Telephone calls were placed to Dr. Bell's office on April 8, April 11 and April 14, 1997 requesting copies of the doctor's office records on Mr. Archible. Follow-up calls were also placed on April 17 and April 18, 1997, however, the office was closed. To date, we have not received any additional records.

The most recent objective evaluation we have of Mr. Archible's condition is a report of neurologic independent medical examination dated November 30, 1995 by Dr. Elias Chalhub. He reported Mr. Archible's complaints of headaches (under reasonable control with medication), spasm in his back and some intermittent dizziness. The neurologic examination was normal with normal muscle strength, normal reflexes and normal cranial nerve findings. X-rays showing discs at two levels did not appear to be causing any significant radiculopathy, myelopathy or other symptoms.

Dr. Chalhub did not feel that Mr. Archible should have any functional limitations, although perhaps he should not lift in excess of 50 to 70 pounds. He was felt to be capable of performing most normal duties.

In summary, we do not have documentation that Mr. Archible has been under the regular care of a physician as required by the Bell Atlantic Long Term Disability plan. Also, the examination in November, 1995 by Dr. Chalhub does not substantiate an inability to engage in any occupation for which Mr. Archible may be qualified. Total or partial disability cannot be established. Therefore, the determination terminating Long Term Disability benefits as of May 31, 1996 remains in effect.

This determination is the final decision on review and constitutes completion of the full and fair review required by Mr. Archible's Plan and federal law.

Should you wish to pursue this matter further, you should consult the information provided concerning Mr. Archible's rights, as set forth in his Summary Plan Description (SPD). A copy of the SPD may be obtained by contacting the Human Resources or Personnel Division of his employer.

Please be advised that under the provisions of Mr. Archible's Plan, no further

administrative appeals are available to him concerning his disability benefit.

(*Id.*)

27. On the same date that the Appeals Council's decision was made, MetLife received a facsimile transmission from Dr. Bell's office consisting of a history and physical chart completed on June 6, 1995, clinical notes from July 9, 1996 and September 9, 1996, lab work, and a colonoscopy report. (Doc. 15, Exhibit 37) The clinical notes contained no relevant objective findings to support Archible's complaints of pain and, more importantly, those notes reflect that *on September 9, 1996 plaintiff voiced no complaints.* (*Id.*) Upon receipt of this facsimile transmission, Lisa Sisson wrote the following letter to Wilkerson on April 22, 1997:

Please be advised, the fax received from Dr. Bell has been reviewed and does not change the status of Mr. Archible's withdrawal. The medical information from Dr. Bell basically provides a list of drug allergies, current medications, eye exam notes and a colonoscopy report dated 4/9/97.

As indicated in the letter of April 22, 1997 from Anne Stanton, under the provisions of this plan, no further appeals are available concerning this claim.

(Doc. 15, Exhibit 38)

28. On August 21, 1997, plaintiff's new attorney, T. Allen Tippy, Esquire, wrote a letter to MetLife regarding Anne Stanton's April 22, 1997 letter to Wilkerson.

(*See id.*, Tippy's August 21, 1997 Letter to Anne Stanton)

I am in receipt of your letter of April 22, 1997 to Ms. Sonje Wilkerson concerning this account and your reasons for termination of the benefits. I have instructed Mr. Archible that if he wishes to renew the policy he must provide proof that he has been under a physician's care continuously in direct relation to the on the job injury. I have enclosed a report from Dr. Raymond Bell which should satisfy the requirements of your letter of April 22, 1997.[8] Should you wish to obtain all records which Dr. Bell has, I would ask that you simply send me a medical authorization form and I will have Mr. Archible sign it and return [it] immediately so as to speed your evaluation of this claim. Further, as Dr. Bell's letter states, you may contact his office directly if more information is required.

Mr. Archible has conveyed to me that he has not received any benefits since May of 1996, which your letter seems to confirm. It is our position that this policy was terminated wrongfully and in bad faith as Mr. Archible provided all records which he had in his possession and sought continuous treatment as confirmed by Dr. Bell's record of August 13.[D]r. Bell also conveyed to me that he allowed Met Life to obtain his medical records, which also seems to be confirmed by your letter of April 22, 1997.

8. Dr. Bell's August 13, 1997 letter reads in relevant part as follows:

Mr. Archible continues to have problems related to a motor vehicular accident he experienced in 1989. As you remember, he has a herniated disc involving C5–6 and C6–7. As a result of this accident, he continues to have cervical radiculopathy and possible spinal stenosis as noted on the MRI. Mr. Archible has been seen by me on somewhat of a regular basis and continues to have chronic pain involving his head, neck, shoulders, and back. In addition, he suffers from insomnia, dizziness, memory loss, numbness in his hands and arms. It is necessary to treat him with Codeine # 4 for pain relief. Obviously the treatment regimen and chronic pain interferes with his

normal daily activities. As a result of this injury, he is able to sit, stand and walk for only a short period of time, perhaps each maneuver 15 minutes to a ½ hour. He can carry no more than ten pounds. He is unable to twist, turn, bend, stoop, pull or reach as a result of the pain. His operation of a motor vehicle is dependent upon medication and often the medication will make him drowsy. He is currently being treated with hot compresses and physical therapy that he performs himself along with pain medications. His last visit to my office was June 27, 1997. Prior to that time, April 7, 1997 and January 6, 1997.

(*See id.*, Raymond Bell's August 13, 1997 Letter)

It is our position that although Met Life made a few calls to the physician and got little reply, that this should not be a basis for the termination of the benefits. We assert that Met Life has a duty to diligently pursue this matter for a fully advised evaluation and therefore contact should be made with Mr. Archible's physician to determine that he in fact has sought continuous treatment and does indeed have severe limitations which inhibit his ability to obtain gainful employment. Should Met Life not wish to diligently obtain the information which they require and a well informed ruling on this account, I have advised Mr. Archible of his right to file suit grounded in a bad faith termination of benefits, however I hope that this dispute does not get that far.

(*Id.* (footnote added)) MetLife advised Tippy on September 23, 1997, however, that as stated "in the letter of April 22, 1997, no further appeals are available in reference to this claim." (*See id.*, MetLife's September 23, 1997 Letter to Allen Tippy)

29. Dr. Bell wrote his final "To Whom It May Concern" letter on October 12, 1999, stating therein that he initially examined Archible on June 6, 1995 and became the plaintiff's primary care physician in 1996. (Doc. 36, Exhibit 27)

### CONCLUSIONS OF LAW

1. Plaintiff filed suit in this Court on April 7, 1999, alleging a violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.* (Doc. 1) More specifically, the plaintiff alleges that MetLife violated § 1132(a)(1)(B) by wrongfully terminating his long-term disability benefits under the Group Long Term and Partial Disability Insurance plan issued to his employer, Bell Atlantic. (*See id.*)

2. "Although it is a comprehensive and reticulated statute, ERISA does not set out the appropriate standard of review for actions under § 1132(a)(1)(B) challenging benefit eligibility determinations." *Firestone Tire & Rubber Co. v.*

*Bruch,* 489 U.S. 101, 108–109, 109 S.Ct. 948, 953, 103 L.Ed.2d 80 (1989) (internal quotation marks and citations omitted). Therefore, the Supreme Court in *Firestone* articulated the appropriate standard of review in § 1132(a)(1)(B) actions challenging denials of benefits based on plan interpretations. *Id.* at 115, 109 S.Ct. at 956–59. "[W]e hold that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.*

3. The undersigned has previously determined that the *de novo* standard of review is applicable in this case. (Doc. 32) Under this standard of review, the undersigned now finds that MetLife's termination of plaintiff's long-term disability benefits is due to be affirmed.

4. Under the Bell Atlantic plan, there are two categories of total disability. Under the first category, the plan provides that during the first twenty-four months, after a six month qualifying period, an employee is totally disabled if he is "unable to perform the normal duties of [his] regular occupation for any employer and [he] at no time engage[s] in any occupation or employment for pay or profit." Under the second category, after the first twenty-four months, an employee is totally disabled if he is "completely unable to engage in any occupation or employment for which [he is] or become[s] qualified." An employee may be qualified because of his education, training or experience.

5. There is no dispute between the parties that Archible was totally disabled as defined by the plan under the first category of total disability and, in addition, that Archible received benefits under the second category of total disability until May of 1996. There is also no dispute between the parties that the administrator of the plan had the authority to reevaluate plaintiff's claim from time to time to determine whether written proof of his total disability claim "is continuous." The reevaluation in

this case was begun by Travelers, the predecessor plan administrator to MetLife, in 1993 and ended with the May, 1996 termination of benefits by MetLife.

6. Having reviewed all the medical records and opinions before (and not before) the plan administrator in making its decision to terminate Archible's long-term disability benefits, the undersigned finds additional evidence presented to the administrator to support the conclusion that plaintiff was no longer disabled. More to the point, the medical assessments of Archible's disability and the extent of his physical impairment changed during the time that the administrator was reevaluating his claim. The most significant change came when Dr. James Burton opined on a Attending Physician's Statement dated March 2, 1995 that plaintiff could perform repetitive movements with both hands, sit, stand and walk continuously for eight hours each, continuously lift ten pounds and frequently lift ten to twenty pounds. The significance of this assessment is clear when same is compared to Burton's assessment dated November 15, 1993 wherein the findings are made that plaintiff cannot perform repetitive fine finger movements of the dominant right hand and can only occasionally lift up to twenty pounds. The record up until March 2, 1995 is also remarkable for the lack of any significant objective clinical findings to support Archible's claim of continuing total disability. For instance, when Archible was examined by neurologist Eugene Quindlen on September 29, 1993, he had no para-cervical muscle spasm, good cervical range of motion, and review of his April 1993 MRI showed old centrally ruptured discs at C5–6 and C6–7,

with some other changes at C3–4 and C4–5, and some decrease in the height of C6 but adequate room for his cord and roots. The other critical piece of evidence which the plan administrator obtained prior to terminating benefits was the November 7, 1995 independent medical examination conducted by Elias Chalhub, a neurologist. Chalhub's record of examination contains absolutely no significant clinical findings, the examiner specifically noting that plaintiff had "a normal neurologic examination with normal muscle strength, normal reflexes and normal cranial nerve findings[,]" and, in addition, it contains the opinion that Archible "should not have any significant functional limitations, perhaps not lifting in excess of 50 to 70 pounds, but certainly he is able to perform most normal duties." Finally, Dr. Bell's only clinical findings made in this case, those on June 6, 1995, actually support the opinions of Drs. Burton and Chalhub. (See Doc. 36, Exhibit 30 (noting movement of neck in all directions without significant pain, no dizziness on flection of neck, no cervical adenopathy, good reflexes of extremities, strength in both legs, squatting and bending accomplished without difficulty, no significant pain or tenderness on palpation of the lumbar area, rotation of waist and torso accomplished without difficulty, and sensory perception found to be intact)) Accordingly, the undersigned finds that this medical evidence, when compared to the Dictionary of Occupational Titles' descriptions of the six jobs identified by MetLife, clearly establishes that the plan administrator correctly terminated Archible's benefits upon finding that plaintiff was no longer completely unable to engage in any occupation or employment for which he was qualified.[9]

9. In reaching this conclusion, the Court recognizes the fact that the Social Security Administration ("SSA") continued Archible's benefits following a periodic review in 1995, the review encompassing the June, 1995 referral of plaintiff to Dr. Bell for a disability determination examination. However, as explained *infra*, Bell's findings on that examination are entitled to no weight and therefore, the determination of continuing disability by the SSA cannot be dispositive of the issue

before this Court particularly since there is no indication that the SSA considered the medical evidence in this case which undeniably supports the plan administrator's termination of benefits. *See Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1452 n. 5 (11th Cir.1997) ("We find unpersuasive Paramore's assertion that the district court should have given greater weight to the Social Security Administration's determination that Paramore was total-

■ 7. Prior to specifically looking at the six occupations identified by MetLife, the undersigned need note that Dr. Bell's numerous comments regarding plaintiff's disability are unhelpful on the issue of whether plaintiff was totally disabled from engaging in any occupation or employment given the total lack of objective findings from the internist supporting a finding of complete disability. In fact, a review of Bell's numerous disability letters reveal that his disability findings are based entirely upon Archible's subjective complaints rather than any objective findings.[10] Accordingly, this Court gives no weight or credence whatsoever to Bell's conclusory disability opinions cited throughout this decision.[11]

8. Claims representatives for Travelers and MetLife determined that plaintiff could transfer the work skills he possessed in his job as senior field engineer for Bell Atlantic to several sedentary and light positions in the same industry, namely, scale model maker, assembler, test-desk supervisor, electronic scale tester, printed circuit board assembly group leader, and switchgear repairer, and plaintiff makes no

argument that the skills he possessed as a senior field engineer are not transferable to these identified jobs.[12] Because these six jobs are denoted in the DOT as either light or sedentary in terms of exertional level (see DOT §§ 710.361–010 (light), 710.381–046 (light), 722.381–010 (light), 726.361–014 (light), 729.684–038 (light), 822.131–030 (sedentary)), the DOT describing sedentary work as requiring sitting most of the time with occasional standing and walking and exerting up to ten pounds of force occasionally and/or a negligible amount of force frequently to lift, carry, push, pull or otherwise move objects and light work as requiring standing or walking to a significant degree or siting most of the time with pushing and pulling or arm or leg controls and exerting up to twenty pounds of force occasionally and/or up to ten pounds of force frequently and/or a negligible amount of force constantly to move objects (see id., at 1013), and the assessments of Drs. Burton and Chalhub reveal that plaintiff can perform the requirements of sedentary and light work, it is imminently clear to this Court that plaintiff is capable of performing other jobs pursuant to the second category of total disability in the Bell Atlantic plan.[13]

ly disabled. Although a court may consider this information in reviewing a plan administrator's decision regarding eligibility for benefits under an ERISA-governed plan, ... an award of benefits by the Social Security Administration is not dispositive of the issue before us, particularly given the measure of deference that we afford a plan administrator's decision.").

10. Bell's stated opinion to the SSA that as of June 6, 1995, Archible was disabled from a mental standpoint is also rejected as being conclusory. Moreover, at no time before or after Bell became plaintiff's primary care physician in 1996 was mention made of plaintiff's depression or another mental impairment, nor is there any record of any medication being prescribed for a mental condition, and therefore, to the extent plaintiff suffered from depression in June, 1995, that condition was temporary and, in fact, resolved by the time Chalhub examined him in November of 1995.

11. In addition, the Court rejects the Attending Physician's Statement completed by Dr. Michael Scott and back-dated by him to April 13, 1994. Though Scott received the APS sometime in July of 1995, he back-dated the

form to April 13, 1994 to coincide with plaintiff's visit to Dr. Thangada, a neurologist. Scott's APS is rejected because it was inappropriate for him to complete the form in Thangada's stead particularly since he did not have before him for review the results of Thangada's April 13, 1994 examination. It is again apparent to the Court that the only basis for Scott's findings on the form was the subjective complaints of plaintiff and therefore, this evidence is deserving of no weight.

12. A comparison of the job skills plaintiff had as a senior field engineer with Bell Atlantic (see Doc. 15, Attachment A, JOB DESCRIPTION) with the job skills of the foregoing jobs identified by the plan administrator (see Dictionary of Occupational Titles, Volume II §§ 710.361–010, 710.381–046, 722.381–010, 726.361–014, 729.684–038, 822.131–030 (4th ed.1991)) quickly reveals why plaintiff tenders no argument that his senior field engineer job skills are not transferable to those six jobs identified by the plan administrator.

13. Even had the Court not considered the vocational evidence contained in this record, the result would have been the same given the

## CONCLUSION

The Court concludes after a *de novo* review of the entire administrative record in this case that the plan administrator in this case, MetLife, appropriately terminated plaintiff's long-term disability benefits under the second category of total disability contained in the Bell Atlantic plan.[14]

clear evidence of record that plaintiff can perform at least light and sedentary work. *See McKenzie v. General Tel. Co. of California*, 41 F.3d 1310, 1317 (9th Cir.1994) ("[W]e hold that consideration of vocational evidence is unnecessary where the evidence in the administrative record supports the conclusion that the claimant does not have an impairment which would prevent him from performing some identifiable job. The plan administrator is not required in every case where the 'any occupation' standard is applicable to collect vocational evidence in order to prove there are available occupations for the claimant."), *cert. denied*, 514 U.S. 1066, 115 S.Ct. 1697, 131 L.Ed.2d 560 (1995); *Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1309 (5th Cir.1994) (finding that the plan administrator did not abuse his discretion in deciding that the plaintiff was capable of performing some type of occupation without obtaining the opinion of a vocational rehabilitation expert since the evidence demonstrated that "Duhon was a sixty-five year old man in overall good health with a high school diploma and moderate restrictions on his physical ability."). Moreover, the undersigned reaches the same conclusion reached in *Duhon* and that is that "[g]iven [the] undemanding language [contained in the second category of total disability] and the medical evidence in this case, the plan administrator could competently determine disability without vocational testimony." 15 F.3d at 1309.

14. In reaching this conclusion, the Court finds it unnecessary to address at length Met-Life's alternative argument that it properly terminated benefits on the basis that plaintiff was not under the active and continuing care of a physician. A lengthy analysis of this issue would not be particularly beneficial to the defendant since the only references in the plan to treatment or care by a physician are made in relation to the initial determination of eligibility for plan benefits. This plan requirement was admittedly satisfied inasmuch as plaintiff received disability benefits under both categories of total disability. For the defendant to read the two portions of the plan in which treatment by a physician is mentioned to require that plaintiff remain under the monthly or "active" care of physician ignores both the clear language of the plan and the practical realities of physician care in this day and age. It is clear to the Court that most, if not all, physicians at some point in their course of treatment of an individual will find that the individual has reached maximum medical improvement and need come seek their care only on an as needed (i.e., PRN) basis. Therefore, while a lack of medical evidence may lend credence to the finding that an individual is no longer totally disabled from performing all occupations, it cannot serve as an independent basis upon which to terminate benefits.